UNITED STATES of America,

v.

Glen BENUSSI, Defendant.

No. S5 CR 1267 LAK.

United States District Court, S.D. New York.

Aug. 20, 2002.

David B. Anders, Assistant United States Attorney, James B. Comey, United States Attorney, New York City, for U.S.

---

1. 18 U.S.C. § 371.

Terrance A. Bostic, Williams Schifino Mangione & Steady P.A., Tampa, FL, Kevin H. Marino, Newark, NJ, Wendy E. Gerstmann, New York City, Kevin H. Marino P.C., Newark, City, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

The central question now presented in this conspiracy case is whether the evidence was sufficient to permit a finding, beyond a reasonable doubt, that defendant or one of his co-conspirators committed an overt act in furtherance of the conspiracy during the statutory limitations period. As the Court is persuaded that the evidence was sufficient to permit this conclusion, defendant's conviction will stand.

### *I. Facts*

The one count indictment in this case charges defendant Glen Benussi with conspiracy [1] to commit securities fraud, in violation of 15 U.S.C. §§ 77q(a), 77x, wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and commercial bribery, in violation of 18 U.S.C. § 1952(a)(3). After a five day trial, the jury returned a guilty verdict. Benussi moved for judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure and, in the alternative, for a new trial pursuant to Rule 33. On July 1, 2002, the Court denied the motion in all respects and expressed its intention to file an opinion stating its reasons in detail. On further reflection, the Court came to the conclusion that the reasoning behind its July 1 decision was flawed, asked the parties for further submissions, and heard further argument. Having considered these submissions, the Court is persuaded that defendant's motion was denied correctly, but for reasons other than those previously stated on the record.

## A. The Evidence at Trial

The salient facts, viewed in the light most favorable to the government,[2] are as follows.

### 1. The Gaylord IPO

In September 1995, Benussi and three other principals, Howard Zelin, Marco Fiore, and Benjamin Salmonese, opened an office of Nationwide Securities, Inc. ("Nationwide") at 100 Wall Street in Manhattan.[3] In October, they agreed that Nationwide would co-underwrite an initial public offering ("IPO") of securities of The Gaylord Companies ("Gaylord").[4] On October 31, 1995,[5] Gaylord issued 750,000 shares of common stock at $3 per share and 1,500,000 warrants at $0.10 per warrant.[6] The offering plan called for brokers to offer customers one share of Gaylord common stock together with two Gaylord warrants.[7] Instead of following the offering plan, the Nationwide principals and their brokers devised a scheme to "strip" one warrant from each customer transaction.[8] "Stripping" consisted of selling to customers one share of common stock and one warrant, while retaining one warrant from each unit for the co-conspirators.[9]

The stripped warrants were allocated among the four principals and brokers (both registered and unregistered) at the firm.[10] The principals received nearly equal allocations of stripped warrants[11] while brokers received allocations "based on their production and how many shares of the IPO they could sell."[12]

The central goal of the Gaylord IPO scheme was to create an artificial demand for Gaylord securities, thus pumping up the price of the stock and warrants in order to allow principals and brokers to sell their stripped warrants at inflated prices.[13] To achieve this purpose, the principals directed the brokers to engage in fraudulent sales tactics such as preselling shares in the IPO, crossing sales, tying sales of IPO shares in with purchases in the aftermarket, talking clients out of selling stock, and refusing to execute sale orders.[14] Brokers engaged in improper tactics both before and after the effective date of the IPO.[15]

Fiore, Salmonese, Zelin, Benussi and the brokers created nominee accounts to hide their beneficial interests in the stripped warrants.[16] With two exceptions, they

---

2. *E.g., United States v. Autuori,* 212 F.3d 105, 114 (2d Cir.2000); *United States v. Guadagna,* 183 F.3d 122, 129 (2d Cir.1999).

3. Tr. 116, 138. Before September 1995, Benussi had a Nationwide office at 5 Hanover Square in Manhattan. He and Zelin then moved the office to 100 Wall Street, where Zelin previously had run a branch of Baron Chase. *See id.* at 137, 407–08.

4. *Id.* at 210.

5. *Id.* at 224.

6. *Id.* at 211–12.

7. *Id.* at 212, 215.

8. *Id.* at 214–15; *see id.* at 421.

9. *Id.* at 214–15.

10. *See id.* at 214–217.

11. *Id.* at 217.

12. *Id.* at 223; *see also id.* at 429.

13. *See id.* at 219, 421.

14. *Id.* at 219–222, 225, 423–24, 429.

15. *See id.* at 424 (meetings about tying in sales and preselling occurred before IPO); *id.* at 432–33 (describing how Fiore pressured brokers to keep selling stock after effective date of IPO); *id.* at 444–45 (describing practices of crossing sales and talking clients out of selling stock after effective date of IPO).

16. *See id.* at 216–18, 223–24, 429; *see also* GX 500 *passim.*

caused their nominee accounts to buy stripped Gaylord warrants at the IPO price of $0.10 per warrant on the effective date of the IPO.[17]

The first exception is David Lavender, who bought 4,000 Gaylord warrants on November 10, 1995 at the IPO price of $0.10 through the account of his girlfriend, Denise Coleman. He bought 10,998 more on December 5, 1995 at the same price of $0.10.[18]

The second is Louis Pascuito, who purchased 15,000 Gaylord warrants on January 5, 1996 for $1.30 per warrant in an account in the name of his father-in-law to be, Robert Feehan.[19] On March 13, 1996, he bought 16,000 more at $1.06 per warrant in an account in the name of his then-girlfriend, Stefanie Feehan.[20] Pascuito is unique in that he did not obtain any Gaylord warrants at the IPO price of $0.10 per warrant, and the only reasonable conclusion from this is that he purchased warrants in the aftermarket that were not stripped from the IPO.[21]

After acquiring their Gaylord warrants, neither principals nor brokers were free to sell them immediately. Instead, Fiore told them when they were permitted to do so.[22] Zelin testified that Fiore restricted their ability to sell "because he was running the retail brokers and he wanted to create enough buying so that we would be able to sell our warrants without damage, you know, bring[ing] the market lower."[23] Ac-

---

**17.** GX 500, B. 12686 (Benussi nominee); *id.* at B. 12690 (Benussi nominee); *id.* at B. 12698 (Fiore nominee); *id.* at B. 12705 (Fiore nominee); *id.* at B. 12713 (Salmonese nominee); *id.* at B. 12719 (Salmonsese nominee); *id.* at B. 12720 (Salmonese nominee); *id.* at B. 12726 (Salmonese nominee); *id.* at B. 12731 (Zelin nominee); *id.* at B. 12736 (DeCeglie nominee); *id.* at B. 12737 (DeCeglie nominee); *id.* at B. 12746 (DeSimone nominee); *id.* at B. 12753 (DeSimone nominee); *id.* at B. 12757 (Eisemann nominee); *id.* at B. 12766 (Lawlor nominee); *id.* at B. 12773 (Lawlor nominee); *id.* at B. 12790 (Piscitelli nominee); *id.* at B. 12796 (Restivo nominee). Eisemann's testimony confirms that brokers filled out buy tickets for their nominees on October 31, 1995, submitted the tickets to Fiore on that day, *see* Tr. 438, and paid for the warrants, *see id.* at 430.

**18.** GX 500, B. 12761.

**19.** *Id.* at B. 12785. Defendant argues that the evidence is insufficient to support a conclusion that Pascuito controlled the Robert Feehan account, noting correctly that transcript pages 224 and 238 do not go that far. *See* Def. Reply Mem. 2 n. 1. His focus, however is too narrow. Stefanie Feehan's testimony established that she never knowingly purchased securities of Gaylord or Thermo–Mizer, *see* Tr. 507–08, which of course were purchased in the account in her name, that Pascuito opened that account and controlled the relevant transactions, *see id.* at 509–11, 513–14,

and that Pascuito treated the proceeds of the account as his own, *see id.* at 511–12. Zelin's testimony is at least susceptible of the interpretation that both the Robert and Stefanie Feehan accounts were nominee accounts set up by Pascuito to receive the warrants. *See* Tr. 266; *see also* GX 92, 226. The jury therefore was entitled to find that Pascuito controlled and was responsible for everything that occurred in the Robert Feehan account as well.

**20.** GX 500, B. 12781.

**21.** Pascuito was not the only co-conspirator who bought Gaylord warrants in the aftermarket. *E.g.,* GX 500, B. 12686 (Benussi nominee purchased 10,000 Gaylord warrants on November 13, 1995 for $1.19 per warrant); *id.* at B. 12713 (Salmonese nominee purchased 14,000 Gaylord warrants on November 24, 1995 for $1.00 per warrant); *id.* at B. 12736 (DeCiglie nominee purchased 8,050 Gaylord warrants on November 9, 1995 for $0.94 per warrant); *id.* at B. 12790 (Piscitelli nominee purchased 2,800 Gaylord warrants on November 30, 1995 for $1.13 per warrant). Pascuito, however, was the only co-conspirator who did not purchase any Gaylord warrants at the IPO price of $0.10.

**22.** *See* Tr. 225–26, 434.

**23.** *Id.* at 226.

cording to Zelin, Fiore gave the co-conspirators permission to sell their stripped warrants in mid-November, one to two weeks after the effective date of the Gaylord IPO.[24] Most of the co-conspirators sold their warrants in series of transactions rather than in single blocks. Putting aside Pascuito, who will be discussed in detail below, there was a spurt of selling activity in November 1995, moderate selling activity in December 1995 and January 1996, and sparse selling activity as late as March 13, 1996.[25] Pascuito sold the Gaylord warrants he purchased in the aftermarket on or after May 8, 1996.[26]

## 2. The Thermo–Mizer IPO

In February 1996, Nationwide participated as lead underwriter in an IPO of the securities of Thermo–Mizer Environmental Corporation ("Thermo–Mizer").[27] On February 28, 1996, Thermo–Mizer issued 750,-000 shares of common stock at $5.00 per share and 1,500,000 warrants at $0.10 per warrant.[28] Again, the offering memorandum called for brokers to sell one share coupled with two warrants, but the co-conspirators agreed that they would sell one share and one warrant, allocating one stripped warrant from each transaction to themselves.[29] As before, Nationwide prin-

---

24. *See id.* at 224–26. The documentary evidence suggests that permission was given somewhat earlier in November 1995. *E.g.,* GX 500, B. 12690; *id.* at B. 12698; *id.* at B. 12713; *id.* at B. 12731; *id.* at B. 12736; *id.* at B. 12746; *id.* at B. 12757; *id.* at B. 12766. *But see id.* at B.12790 (Piscitelli nominee sold Gaylord warrants for first time on December 1, 1995); *id.* at B. 12796 (Restivo nominee sold Gaylord warrants for the first time on January 18, 1996). Lavender did not sell his Gaylord warrants for the first time until December 12, 1995. *Id.* at B. 12761. Pascuito sold his Gaylord warrants for the first time on January 10, 1996, five days after he acquired them on January 5, 1996. *Id.* at B.12781.

25. *E.g., id.* at B. 12686 (Benussi nominee selling Gaylord warrants on December 21, 1995 and January 19, 1996); *id.* at B. 12690 (Benussi nominee selling Gaylord warrants on five occasions, between November 1, 1995 and January 24, 1996); *id.* at B. 12698 (Fiore nominee selling Gaylord warrants on seven occasions, between November 3, 1995 and November 27, 1995); *id.* at B. 12705 (Fiore nominee selling Gaylord warrants on eleven occasions, between November 10, 1995 and February 12, 1996); *id.* at B. 12713 (Salmonese nominee selling Gaylord warrants on three occasions, between November 3, 1995 and January 15, 1996); *id.* at B. 12719 (Salmonese nominee selling Gaylord warrants on four occasions, between November 8, 1995 and January 23, 1996); *id.* at B. 12720 (Salmonese nominee selling Gaylord warrants on four occasions, between November 10, 1995 and March 13, 1996); *id.* at B. 12726 (Salmonese nominee selling Gaylord warrants on December 28, 1995); *id.* at B. 12731 (Zelin selling Gaylord warrants on January 19, 1996); *id.* at B. 12736 (DeCeglie nominee selling Gaylord warrants on four occasions, between November 8, 1995 and January 23, 1996); *id.* at B. 12737 (DeCeglie nominee selling Gaylord warrants on four occasions, between November 10, 1995 and March 13, 1996); *id.* at B. 12746 (DeSimone nominee selling Gaylord warrants on seven occasions, between November 6, 1995 and November 27, 1995); *id.* at B. 12753 (DeCiglie nominee selling Gaylord warrants on November 15, 1995); *id.* at B. 12757 (Eisemann nominee selling Gaylord warrants on November 20, 1995); *id.* at B. 12761 (Lavender nominee selling Gaylord warrants on three occasions between December 12, 1995 and December 15, 1995); *id.* at B. 12766 (Lawlor selling Gaylord warrants on seven occasions, between November 3, 1995 and November 27, 1995); *id.* at B. 12773 (Lawlor nominee selling Gaylord warrants on eleven occasions, between November 10, 1995 and February 12, 1996); *id.* at B. 12790 (Piscitelli nominee selling Gaylord warrants on December 1, 1995 and February 16, 1996); *id.* at B. 12796 (Restivo nominee selling Gaylord warrants on January 18, 1996 and January 24, 1996).

26. *Id.* at B. 12781.

27. Tr. 232.

28. *See id.* at 231–34.

29. *Id.* at 233–34, 455.

cipals and brokers purchased the stripped warrants through nominee accounts on the effective date of the IPO for the IPO price of $0.10 per warrant.[30] And again, the main purpose of the scheme was to manipulate the prices of Thermo–Mizer securities in order to allow co-conspirators to sell their stripped warrants at artificially inflated prices.[31] Nationwide brokers created artificial demand for Thermo–Mizer securities both before and after the effective date of the IPO by engaging in the same fraudulent, high pressure sales tactics mentioned above.[32]

Fiore authorized the principals and brokers to sell their warrants promptly after the IPO.[33] Again, they generally sold their warrants in series of transactions rather than in single blocks.[34]

### 3. Use of the Rum Account

A few weeks after the effective date of the Thermo–Mizer IPO, the prices of Gaylord and Thermo–Mizer securities began to decline.[35] In order to support the prices, Nationwide brokers began engaging in unauthorized trades in customer accounts.[36] Clients complained, and the Nationwide home office began reversing trades, causing the firm's inventory of these securities to grow.[37]

Responding to the increased inventory and general downturn, Fiore, Salmonese, Pascuito, and Richard Lawlor used one of Benussi's nominee accounts, Rum United, as a trading account to buy free-trading Gaylord and Thermo–Mizer securities in the hope of reducing the supply and supporting the price.[38] They purchased securities on March 4, 1996 (Gaylord warrants),[39] March 7, 1996 (Thermo–Mizer warrants and Gaylord common stock),[40] and March 12 (Thermo–Mizer warrants).[41]

---

30. *See id.* at 234–36; GX 500, B. 12687; *id.* at B. 12691; *id.* at B. 12695; *id.* at B. 12700; *id.* at B. 12706; *id.* at B. 12714; *id.* at B. 12721; *id.* at B. 12727; *id.* at B. 12732; *id.* at B. 12738; *id.* at B. 12749; *id.* at B. 12762; *id.* at B. 12768; *id.* at B. 12782; *id.* at B. 12791; *id.* at B. 12793; *id.* at B. 12797; *id.* at B. 127802; *see also* Tr. 238 (Zelin testimony indicating that brokers used nominee accounts for the Thermo–Mizer IPO and that Pascuito put his warrants in Stefanie Feehan's account).

31. Tr. 236–37.

32. *Id.* at 236–37, 455; *see also id.* at 458–59 (describing practices such as crossing sales, avoiding client phone calls, refusing to execute sale orders, and engaging in unauthorized trades during period of decline several weeks after effective date of Thermo–Mizer IPO).

33. *Id.* at 239, 337; *see* GX 500, B. 12738 (DeCiglie nominee sold Thermo–Mizer warrants for first time on February 28, 1996, the effective date of the IPO); *id.* at B. 12749 (DeSimone nominee sold Thermo–Mizer warrants for first time on March 5, 1996); *id.* at B. 12762 (Lavender nominee sold Thermo–Mizer warrants for first time on March 5, 1996); *id.* at B. 12768 (Lawlor nominee sold Thermo–Mizer warrants for first time on February 28, 1996); *id.* at B. 12782 (Pascuito nominee sold Thermo–Mizer warrants for first time on February 28, 1996); *id.* at B. 12793 (Piscitelli nominee sold Thermo–Mizer warrants for first time on February 28, 1996); *id.* at B. 12797 (Restivo nominee sold Thermo–Mizer warrants for first time on March 5, 1996); *id.* at B. 12802 (Riccotone nominee sold Thermo–Mizer warrants for first time on February 28, 1996).

34. *E.g.,* GX 500, B. 12762; *id.* at B. 12774; *id.* at B. 12782; *id.* at B. 12791; *id.* at 12793; *id.* at B. 12797.

35. *See* Tr. 241–42, 457–58.

36. *Id.* at 243–44.

37. *Id.* at 245–46.

38. *Id.*

39. GX 500, B. 12694.

40. *Id.* at B. 12694; *id.* at B. 12695.

41. *Id.* at B. 12695.

There was a substantial amount of money with which to make these trades in the Rum United account because Benussi had made profits from the sale of his stripped warrants from the IPOs.[42]

Benussi soon learned that his account was being used in this manner.[43] He appears to have objected, but Fiore and Salmonese convinced him "that they needed to use this account and this money to buy back the inventory so they [could] maintain the price of the stock."[44] They told him that they eventually would resell the securities and free up his cash, and he was persuaded for the time being.[45] Zelin testified regarding the co-conspirators' motivation for supporting the price of the securities at this time:

"[W]e were concerned [and] we didn't want people to lose all the money and we also didn't want to have problems with clients complaining and then calling the NASD or the S.E.C. and us getting in trouble."[46]

At this time, many of the brokers still had stripped Thermo–Mizer warrants to sell.[47]

### 4. The Theft from the Rum United Account

Some time after Fiore, Salmonese, Pascuito, and Lawlor began using the Rum United account to buy Gaylord and Thermo–Mizer securities, they decided to take the cash and securities there on deposit for themselves.[48] As Zelin testified:

"Marco [Fiore] was not happy with Glen at the time for the amount or for what he was doing, and they wanted to take the money out of the account. The deal was going down, they wanted more money, and they decided to steal the money out of his account."[49]

So Pascuito forged a letter of authorization dated March 11, 1996 from Robert Harmon, one of the people who served as a nominal officer of Rum United on Benussi's behalf.[50] Four days later, he transferred 6,400 shares of Gaylord common stock and 58,285 Thermo–Mizer warrants from the Rum United account to the Robert Feehan account at Nationwide.[51] On or about March 26, 1996, he transferred approximately 14,340 shares of Gaylord common stock and 58,285 Thermo–Mizer warrants from the Robert Feehan account to the Stefanie Feehan account.[52] Al-

---

**42.** Tr. 246; GX 13B.

**43.** Tr. 246.

**44.** *Id.* at 247.

**45.** *Id.*

**46.** *Id.* at 242 (testimony of Zelin).

**47.** *E.g.* GX 500, B. 12762 (Lavender nominee selling Thermo–Mizer warrants on five occasions between March 5 and April 11); *id.* at B. 12782 (Pascuito nominee had 2,250 Thermo–Mizer warrants in account as of the time of the transfer from Rum United account on or about March 26); *id.* at B. 12791 (Piscitelli nominee selling Thermo–Mizer warrants on March 5 and March 12); *id.* at B. 12793 (Piscitelli himself selling Thermo–Mizer warrants on four occasions between February 28 and April 10); *id.* at B. 12797 (Restivo nomi-

nee selling Thermo–Mizer warrants on six occasions between March 5 and March 15).

**48.** *See* Tr. 266–74.

**49.** *Id.* at 274.

**50.** *Id.* at 266–69; *see also* GX 226.

**51.** *See* GX 500, B. 12785 (Gaylord common stock); *id.* at B. 12786 (Thermo–Mizer warrants).

**52.** GX 500, B. 12781 (Gaylord common stock); *id.* at B. 12782 (Thermo–Mizer warrants). The stolen securities were those that Fiore and others bought in the aftermarket through the Rum United account, not Benussi's allotment of stripped warrants. *See* Tr. 274; GX 500, B. 12694; *id.* at B. 12695.

though Benussi attempted to reverse the transfer when he discovered the forgery, Pascuito succeeded in taking control of the securities.[53]

#### 5. Thermo–Mizer Transactions in the Stefanie Feehan Account

The first transaction in the Stefanie Feehan account was the purchase of 27,000 Thermo–Mizer warrants at $0.10 per warrant on February 28, 1996, the effective date of the IPO. Between February 28 and March 7, Pascuito sold a total of 24,750 Thermo–Mizer warrants through the account, leaving 2,250 of the $0.10 warrants in the account.[54] The next transaction was the receipt on or about March 26, 1996 of 58,285 Thermo–Mizer warrants, which had been stolen from the Rum United account.[55] The account then lay dormant until May 3, 1996.

The government's evidence of subsequent sales in the Stefanie Feehan account is best presented in tabular form: [56]

| Trade Date | Settlement Date | Shares Sold | Price |
|---|---|---|---|
| 5/3/1996 | 5/8/1996 | 1,000 | $0.63 |
| 5/3/1996 | 5/8/1996 | 2,000 | $0.44 |
| 5/6/1996 | 5/9/1996 | 500 | $0.44 |
| 5/6/1996 | 5/9/1996 | 2,000 | $0.44 |
| 5/6/1996 | 5/9/1996 | 2,000 | $0.41 |
| 5/7/1996 | 5/10/1996 | 5,000 | $0.38 |
| 5/8/1996 | 5/13/1996 | 4,000 | $0.41 |
| 5/8/1996 | 5/13/1996 | 5,000 | $0.38 |
| 5/14/1996 | 5/17/1996 | 1,000 | $0.38 |
| 5/14/1996 | 5/17/1996 | 9,000 | $0.25 |
| 5/30/1996 | 6/4/1996 | 4,000 | $0.19 |
| 6/21/1996 | 6/26/1996 | 13,025 | $0.19 |
| 6/24/1996 | 6/27/1996 | 12,010 | $0.19 |

#### B. The Indictments

The initial five count indictment in this case was returned on December 11, 2000. It charged nine defendants—Fiore, Salmonese, Thomas Deceglie, Thomas DeSimone, Michael Eisemann, David Lavender, Frank Piscitelli, Peter Restivo, and Michael Riccotone—with one count each of conspiracy to commit securities fraud, wire fraud and commercial bribery, as well as other offenses. Superseding indictment S1 00 Cr. 1267(LAK), returned on February 28, 2001, added Zelin as a defendant.

Superseding indictment S2 00 Cr. 1267(LAK) ("S2") was returned on May 7, 2001. It included Benussi as a defendant on the conspiracy count. Again, the objects of the alleged conspiracy were securities fraud, wire fraud, and commercial bribery.[57] S2 alleged that Benussi and his co-conspirators "agreed to engage in a scheme to manipulate artificially the market price and demand for securities involved in the [Gaylord and Therm–Mizer] IPOs." [58] It alleged further that "[t]o effect this unlawful scheme, [the co-conspirators], prior to the effective date of the Subject IPOs, unlawfully retained undisclosed control over substantial positions in the securities involved in the Subject IPOs by placing them in the names of nominees or offshore corporations." [59] It alleged also that, in conjunction with their undisclosed control of "the securities of the Subject IPOs," the principals at Nationwide, including Benussi, paid secret undisclosed bribes to the brokers and directed them to operate a "boiler room." [60] The alleged

53. *See* GX 90–F; GX 224–26;. GX 232–34; GX; 241–46.

54. GX 500, B. 12782.

55. *Id.*

56. *Id.*

57. S2, ¶ 34.

58. *Id.* ¶ 22.

59. *Id.*

60. *Id.* ¶¶ 23, 25.

boiler room activity consisted of deceptive and manipulative sales practices, such as tying in sales, preselling, making unauthorized trades in customer accounts, refusing to execute sale orders, and crossing sales.[61] According to S2, the purpose of these manipulative sales practices was to create demand for and increase the price of the securities of Gaylord and Thermo–Mizer, in order to enable the co-conspirators "to sell the securities they controlled through the nominees at artificially inflated prices."[62]

S2 alleged that the duration of the conspiracy was October 1995 through "in or about August 1996"[63] and listed ninety overt acts, one of which allegedly occurred after May 7, 1996. Specifically, the government alleged that "[o]n or about August 9, 1996, CC–1 caused a Nationwide customer to sell approximately 850 shares of Thermo–Mizer common stock."[64]

The grand jury subsequently returned several superseding indictments. Benussi ultimately was tried on S5 00 Cr. 1267(LAK) ("S5"), which was returned on August 8, 2001. Again, S5 charged Benussi with conspiracy to commit securities fraud,[65] wire fraud, and commercial brib-

ery.[66] The language of S5 describing the substance of the conspiracy, its scope and purpose, and the means used by the co-conspirators more or less mirrors that of S2.[67]

S5 alleges the time frame of the conspiracy as having been from October 1995 through June 1996. It did not allege that the August 9, 1996 customer transaction constituted an overt act in furtherance of the conspiracy. Instead, it alleged that three different overt acts took place on or after May 7, 1996:

"pp. On or about May 7, 1996, Louis Pascuito caused a Nationwide brokerage account in the name of Pascuito's girlfriend to sell approximately 5,000 Thermo–Mizer warrants at approximately $ 0.38 per warrant."

"qq. On or about May 30, 1996, Louis Pascuito caused a Nationwide brokerage account in the name of Pascuito's girlfriend to sell approximately 4,000 Thermo–Mizer warrants at approximately $ 0.19 per warrant."

"rr. On or about June 24, 1996, Louis Pascuito caused a Nationwide brokerage account in the name of Pascuito's girlfriend to sell approximately 12,010 Ther-

61. *Id.* ¶¶ 23, 24, 27, 28, 29, 30, 31.

62. *Id.* ¶ 23.

63. *Id.* ¶ 34.

64. *Id.* ¶ 39(kkkk).

65. With regard to the securities fraud object, S2 charged Benussi with conspiring to violate 15 U.S.C. §§ 78o(c)(1)(A), 78ff, and 17 C.F.R. § 242.101(a), which prohibit certain conduct between a broker and a customer, in addition to 15 U.S.C. §§ 77q(a) and 77x. *See* S2, ¶ 34. S5 retained the latter allegations, but omitted the former. *See* S5, ¶ 34.

66. Although S5 purported to charge Benussi with substantive offenses in Counts Two and Three, the government conceded that this was an error and dismissed them.

67. *See* S5, ¶¶ 22, 23, 24, 27, 28, 29, 30, 31. There are differences in the details. While S2 alleged that the co-conspirators unlawfully allocated the "securities" of Gaylord and Thermo–Mizer to themselves, *see* S2, ¶ 22, S5 specified that it was warrants, *see* S5, ¶ 22. Additionally, in S2 the "undisclosed bribes" were "in the form of securities of the Subject IPOs that were placed in the names of nominees ..., allow[ing the co-conspirators] to profit from aftermarket sales of securities involved in the Subject IPOs." S2, ¶ 25. In contrast, S5 alleged that the brokers' undisclosed "compensation usually took the form of warrants in the Subject IPOs that were placed in the names of nominees ..., allow[ing] the co-conspirators to profit from aftermarket sales of securities involved in the Subject IPOs." S5, ¶ 25.

mo–Mizer warrants at approximately $ 0.19 per warrant." [68]

### C. Jury Instructions Relevant to Statute of Limitations

As Benussi first was indicted on May 7, 2001, more than five years after the effective date of the IPOs, the timeliness of the prosecution was a central issue at trial. As in any conspiracy case, the Court instructed the jury, *inter alia,* that the government had to prove beyond a reasonable doubt that at least one of the co-conspirators—not necessarily the defendant—had committed an overt act in furtherance of the conspiracy.[69] It pointed out that there were several overt acts listed in the indictment, invited the jury to read the entire list when it retired, and read aloud three overt acts that related to the sale of Thermo–Mizer warrants on or after May 7, 1996.[70] The Court noted that the jury could find the overt act requirement satisfied based on overt acts it found to have been committed in furtherance of the conspiracy, even if those acts were not listed in the indictment.[71]

On the statute of limitations question, the Court instructed the jury that "[i]n order to prove that this prosecution is timely, the government has to prove two things: They have to prove, first, that the conspiracy charged in the indictment was in existence at least as late as May 7, 1996; second, it has to prove that either the defendant or one of his co-conspirators performed at least one overt act in fur-

therance of the conspiracy on or after May 8, 1996." [72]

As to the first prong, the Court instructed the jury further that a conspiracy continues in existence until its central purpose has been attained. It then stated:

"If you find that the central purpose of any conspiracy knowingly entered into by Mr. Benussi involved the receipt of economic benefit, then I instruct you further that the conspiracy continued until all of the conspirators received their anticipated economic benefits or payoffs, but no longer. It is solely for you to determine at what time the alleged co-conspirators received their anticipated economic benefits, if in fact that occurred."

"I should also add that the government has not alleged [n]or attempted to prove that the defendant knowingly entered into any subsidiary or subordinate conspiracy to conceal the alleged crime with which he is charged. Any actions taken by the alleged co-conspirators solely to conceal an already-committed crime are not a permissible basis for inferring the existence of a conspiracy on or after May 8, 1996." [73]

Turning to the second prong, the Court referred the jury back to its previous instruction on the concept of an overt act in furtherance of the conspiracy. It emphasized that the jury had to find at least one such overt act on or after May 8, 1996, and charged the jury that this overt act need not be one alleged in the indictment.[74]

---

**68.** S5, ¶ 38(pp)-(rr). Comparison with GX 500 reveals that S5 used the trade date, as opposed to the settlement date, as the operative one for these overt acts.

**69.** Tr. 783.

**70.** *Id.* at 783–84. The Court told the jury that it was picking out these particular over acts because "they are relevant to some of the

points made during closing arguments." *Id.* at 783.

**71.** *Id.* at 784, 785.

**72.** *Id.* at 787.

**73.** *Id.* at 787–88.

**74.** *Id.* at 788.

*D. The Government's Summation*

The government argued that Louis Pascuito's sale of Gaylord and Thermo–Mizer warrants on or after May 8, 1996 satisfied the statute of limitations.[75] It focused the jury's attention on Government Exhibit 703C,[76] which tracked the sale of Thermo–Mizer warrants out of the Stefanie Feehan account in May and June 1996.[77] The government argued that the sales in this account were Pascuito's payoff, that he was "dumping his Thermo–Mizer warrants onto the market, onto the unsuspecting public" as late as June 1996.[78] It went on to argue that

> "[t]he heart of this fraud, ladies and gentlemen, is Glen Benussi, Howard Zelin, Marco Fiore and Ben Salmonese and all the Nationwide brokers, including Louis Pascuito, selling Gaylord and Thermo–Mizer warrants to the public. That's how the conspirators were going to get money."

> "Think of this just one other way. Benussi and the other principals . . . needed to pay a bribe to motivate the brokers. The bribe was initially paid in warrants, but that, of course, was just the first step. To complete the scheme, to achieve the goals of the scheme, the goals were to sell the warrants to the public and get cash. It was selling the warrants to the public. That was the last step in completing the scheme, and that's what Louis Pascuito did in May and June of 1996. He sold the warrants to the public and got his money." [79]

In conclusion, the government emphasized that the conspiracy did not end with the closing of Nationwide, but rather when the co-conspirators received their "payoff." [80]

*II. Discussion*

Benussi makes three arguments in support of his motion for judgment of acquittal. First, he contends that, as a matter of law, the government failed to establish that the charged conspiracy continued past May 7, 1996—five years prior to the date that he first was indicted in S2. Second, he argues that S5 does not relate back to S2. Third, he maintains that the government's proof at trial violated his Fifth Amendment rights by constructively amending or varying the terms of S5. He argues also that he is entitled to a new trial because the jury returned a general verdict, and it is impossible to tell whether the jury based its verdict on a permissible or impermissible ground for satisfying the statute of limitations. None of these arguments justify reversing Benussi's conviction or granting him a new trial.

*A. Statute of Limitations*

Benussi first argues that Pascuito's sales of Gaylord and/or Thermo–Mizer warrants could not have satisfied the statute of limitations as a matter of law because the Nationwide office had closed at the time of these sales, the warrants already had been distributed to the co-conspirators, and Pascuito's sales were unilateral acts that did not require the cooperation of Benussi or one of his co-conspirators to carry out.[81] This argument founders on defendant's misconception of the scope of the charged conspiracy.

**75.** *Id.* at 689–91.

**76.** The government drew the jury's attention also to Government's Exhibit 500, which details the activity in the Stefanie Feehan account, including the sale of Gaylord warrants on or after May 8, 1996. *See id.* at 691.

**77.** *Id.* at 690.

**78.** *Id.*

**79.** *Id.* at 691.

**80.** *Id.*

**81.** *See* Def. Mem. 7–8.

### 1. Scope of the Conspiracy

█ Section 3282 of the Criminal Code establishes a five year statute of limitations for noncapital federal crimes.[82] A prosecution for conspiracy is timely if the government charges and proves at trial that (1) the conspiracy was in existence within the five year period preceding the indictment, and (2) at least one overt act in furtherance of the conspiracy was performed within that period.[83] "Once a conspiracy is shown to exist, which in its nature is not ended merely by lapse of time, it continues to exist until consummated, abandoned or otherwise terminated by some affirmative act. Every act in furtherance of the conspiracy is regarded in law as a renewal or continuance of the unlawful agreement, and the conspiracy continues so long as overt acts in furtherance of its purpose are done."[84]

█ The crucial question in determining whether the statute of limitations has run is "the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy."[85] When a general objective of the conspirators is economic gain, the conspiracy continues until they receive their "anticipated economic benefits."[86]

█ Benussi's statute of limitations argument rests on a single premise about the scope of the conspiracy at issue in this case—that the proceeds from the fraud were the warrants and not the money the co-conspirators derived from selling the warrants to the unsuspecting public. This premise is not borne out by the indictment or the evidence at trial.

The indictment is replete with language indicating that the scope of the conspiracy included selling the stripped warrants on the aftermarket at an inflated price.[87] Moreover, the precise scope of the conspiratorial agreement was an issue for the jury,[88] and the government adduced ample evidence at trial from which the jury reasonably could have concluded that the scope of the conspiratorial agreement included selling the stripped warrants at inflated prices.[89]

Benussi's contention that the receipt of the warrants themselves, rather than the money from their sale, was as a matter of law the central purpose of the conspiracy is unsubstantiated.

He begins by reading *United States v. Kissel*[90] and *Fiswick v. United States*[91] as imposing a requirement that a criminal

---

82. 18 U.S.C. § 3282. Because S2 was returned on May 7, 2001, the critical date for purposes of Benussi's first argument is May 8, 1996.

83. *Grunewald v. United States*, 353 U.S. 391, 396–97, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

84. *United States v. Rucker*, 586 F.2d 899, 906 (2d Cir.1978).

85. *Grunewald*, 353 U.S. at 397, 77 S.Ct. 963.

86. *United States v. Mennuti*, 679 F.2d 1032, 1035 (2d Cir.1982); *United States v. Walker*, 653 F.2d 1343, 1347–48, 1350 (9th Cir.1981), *cert. denied*, 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982).

87. S5 ¶¶ 22, 23, 25.

88. *See, e.g., Grunewald*, 353 U.S. at 411, 77 S.Ct. 963; *United States v. Duncan*, 42 F.3d 97, 104–105 (2d Cir.1994); *United States v. Potamitis*, 739 F.2d 784, 788 (2d Cir.), *cert. denied*, 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984); *Walker*, 653 F.2d at 1345–46; *United States v. Floyd*, 496 F.2d 982, 987 (2d Cir.), *cert. denied sub nom. Miller v. United States*, 419 U.S. 1069, 95 S.Ct. 654, 42 L.Ed.2d 664 (1974).

89. *See* Tr. 219, 236–37, 421.

90. 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168 (1910).

91. 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196 (1946).

defendant or one of his co-conspirators actively cooperate with another co-conspirator in order to carry out the overt act within the limitations period. At bottom, however, these cases stand only for the unremarkable propositions, stated above, that the charged conspiracy must be in existence during the limitations period and that there must be an overt act in furtherance of it within the limitations period.[92] Moreover, Benussi's argument is unavailing in light of well-established precedent holding that an overt act perpetrated by one conspirator in furtherance of a conspiracy is chargeable to all members.[93]

Nor does *United States v. Roshko*,[94] also relied upon by Benussi, change the analysis. *Roshko* did not limit *Mennuti*'s holding that a conspiracy continues until the co-conspirators receive their anticipated economic benefits. It simply made clear that the payoff must be within the scope of the charged conspiracy.[95] Although, the *Roshko* court did point out that the *Mennuti* defendant had acted in concert with his co-conspirators during the limitations period,[96] this observation was not vital to its holding. After all, the *Roshko* prosecution was not untimely because of lack of cooperation by the defendant during the limitations period. Rather, it was untimely because the acts that took place during the limitations period were not in furtherance of obtaining a benefit that was within the scope of the charged conspiracy.[97] In this case, the indictment alleged that selling stripped warrants at inflated prices was within the scope of the conspiracy.[98]

---

92. *See Fiswick*, 329 U.S. at 216, 67 S.Ct. 224; *Kissel*, 31 S.Ct. at 126.

93. *See Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942); *Kissel*, 218 U.S. at 608, 31 S.Ct. 124; *United States v. Girard*, 744 F.2d 1170, 1173–73 (5th Cir.1984); *United States v. Chandler*, 586 F.2d 593, 599 (5th Cir.1978), *cert. denied sub nom. Cole v. United States*, 440 U.S. 927, 99 S.Ct. 1262, 59 L.Ed.2d 483 (1979); *see also United States v. Rahman*, 189 F.3d 88, 124 (2d Cir. 1999) ("[W]hen conspiracy is charged, the Government is not required to show that the defendant personally performed acts in its furtherance: it is sufficient for the defendant to join in the illegal agreement."), *cert denied sub nom. Nosair v. United States*, 528 U.S. 982, 120 S.Ct. 439, 145 L.Ed.2d 344 (1999).

94. 969 F.2d 1 (2d Cir.1992).

95. *Id.* at 8.

96. *See id.*

97. *See id.* ("Meir's divorce and subsequent marriage to Irene simply cannot be construed as the 'spoils' or 'payoffs' of the immigration conspiracy.... While the government seems to argue that Irene's 'payoff' was the eventual adjustment in her immigration status, the argument fails, because ... the grand jury did not allege that Irene's acquisition of permanent resident status was an object of the conspiracy.").

98. S5, ¶ 23.

Benussi invokes also *United States v. Nazzaro*, 889 F.2d 1158 (1st Cir.1989), and *United States v. Doherty*, 867 F.2d 47 (1st Cir.), *cert. denied sub nom. Salerno v. United States*, 492 U.S. 918, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989), which held that a conspiracy terminates as a matter of law when "receiving the payoff merely consists of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions, such as receiving salary payments, *and* there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place." *Id.* at 61 (emphasis in original); *accord Nazzaro*, 889 F.2d at 1162–63. His reliance is misplaced, however, because the payoff alleged by the grand jury and about which evidence was adduced at trial did not consist of a lengthy, indefinite series of ordinary, unilateral actions like salary payments, but rather a discrete number of sales within a limited period of time. The *Doherty* court recognized that it *is* reasonable to hold that the act of receiving compensation is part of the conspiracy when "the receiving consists of one action, or a handful of actions, taking place over a limited period of time." *See Doherty*, 867 F.2d at 61.

Thus, the inquiry with respect to the scope of the conspiracy is the sufficiency of the evidence, and the government adduced sufficient evidence that sale of the stripped warrants for cash was the payoff of the charged conspiracy.

### 2. Anticipated Economic Benefits

The next question is whether the government adduced evidence sufficient to allow a reasonable trier of fact to find beyond a reasonable doubt that Benussi or one of his co-conspirators committed an overt act in furtherance of the charged conspiracy on or after May 8, 1996.[99]

A defendant who challenges the sufficiency of the evidence supporting his conviction "'bears a heavy burden.'"[100] Not only must the evidence be viewed in the light most favorable to the government, but the Court must draw all reasonable inferences in its favor.[101] It must consider the evidence in its totality, not in isolation, and "the government need not negate every theory of innocence."[102] "Nonetheless, a conviction based on speculation and surmise alone cannot stand,"[103] and the government must do more than introduce evidence "'at least as consistent with innocence as with guilt.'"[104] The Court "must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, ... 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"[105]

The government's theory was that Louis Pascuito's sales of Thermo–Mizer and/or Gaylord warrants through the Stefanie Feehan account on or after May 8, 1996 were overt acts in furtherance of the conspiracy because they were the actions by which a co-conspirator secured his "anticipated economic benefits" or "payoff."[106] Pascuito's sales in May 1996 fall into four categories: sales of (1) Gaylord common stock stolen from the Rum United account, (2) Gaylord warrants purchased in the aftermarket, (3) Thermo–Mizer warrants stolen from the Rum United account, and (4) stripped Thermo–Mizer warrants purchased on the effective date of the IPO.

As the Court previously ruled, no reasonable trier of fact could have found that Pascuito's sales of Gaylord common stock or Gaylord warrants purchased in the aftermarket were in furtherance of the charged conspiracy because the government offered no proof that the sale of securities purchased in the aftermarket

99. The related question of whether the jury could have found that the conspiracy continued in existence on or after May 8, 1996 is intertwined with this issue. *See Rucker*, 586 F.2d at 906.

100. *United States v. Velasquez*, 271 F.3d 364, 370 (2d Cir.2001) (quoting *United States v. Finley*, 245 F.3d 199, 202 (2d Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 1101, 151 L.Ed.2d 997 (2002)), *cert. denied*, —— U.S. ——, 122 S.Ct. 1382, 152 L.Ed.2d 373 (2002).

101. *Autuori*, 212 F.3d at 114.

102. *Id.*

103. *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir.1994); *see United States v. Wil-*

*son*, 160 F.3d 732, 737 (D.C.Cir.1998) ("A jury is entitled to a vast range of reasonable inferences, but may not base a verdict on mere speculation." (internal quotation marks omitted)), *cert. denied*, 528 U.S. 828, 120 S.Ct. 81, 145 L.Ed.2d 69 (1999).

104. *D'Amato*, 39 F.3d at 1256 (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir.1991), in turn quoting *United States v. Mankani*, 738 F.2d 538, 547 (2d Cir.1984)).

105. *Autuori*, 212 F.3d at 114 (citations omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

106. Tr. 689–91; *see Mennuti*, 679 F.2d at 1035.

was part of the payoff contemplated by the conspiracy.

 Nor could a reasonable jury have concluded that Pascuito's sales of the stolen Thermo–Mizer warrants were in furtherance of the charged conspiracy.[107] The government's argument that the theft was nothing but a squabble among co-conspirators over how to divide the proceeds of the crime proves too much. The stolen warrants simply cannot be characterized as part of the payoff of the charged conspiracy—they were not part of Benussi's allocation of stripped warrants but were purchased in the aftermarket to support the price of Thermo–Mizer securities.[108] Even if their purchase in the Rum account arguably was in furtherance of the conspiracy, it is not a rational inference that their subsequent theft, transfer, and eventual sale by one or more of the co-conspirators furthered the conspiratorial agreement with which Benussi was charged.

This leaves the sales of stripped Thermo–Mizer warrants. As discussed above, the jury reasonably could have concluded that the main purpose of the conspiratorial agreement was the sale of stripped warrants at inflated prices.[109] It follows that the jury reasonably could have found that Pascuito received anticipated economic benefits of the charged conspiracy through these sales. Throughout the trial, the government treated the sales as equivalent to the receipt of the conspiratorial payoff. The difficult issue therefore became whether any rational jury could have concluded that Pascuito sold stripped, as opposed to stolen, Thermo–Mizer warrants on or after May 8, 1996.

### 3. Trade Date Versus Settlement Date

 Prior to the transfer into the Stefanie Feehan account on or about March 26, 1996 of the 58,285 stolen Thermo–Mizer warrants, the account held 2,250 stripped Thermo–Mizer warrants. Assuming that the trade date controls, 12,500 Thermo–Mizer warrants were sold between the date of the Rum United transfer and the close of business on May 7, 1996, and the balance of 48,035 warrants was sold within the limitations period. In this scenario, it

---

**107.** The Court is not persuaded, however, that as a matter of law no theft by one co-conspirator from another ever may be an overt act in furtherance of the conspiracy. *United States v. Adkins,* 274 F.3d 444 (7th Cir.2001), invoked by Benussi, merely stands for the proposition that it was permissible for the government to charge two different conspiracies rather than one large one when a small-quantity drug operation involving some of the same conspirators operated by stealing narcotics from a related large-quantity operation. *See id.* at 449–50. Similarly, *United States v. Lagasse,* 87 F.3d 18 (1st Cir.1996), besides not being binding here, does not stand for the broad proposition that theft from a co-conspirator and subsequent sale of the item stolen can never be acts in furtherance of the conspiracy. In that case, the question was whether a knife used by the defendant to steal drugs from a co-conspirator would trigger the dangerous weapon enhancement for sentencing purposes. *See id.* at 22–24. The court

noted that the "presence" of a weapon at the site of drug trafficking activity will trigger the enhancement when the circumstances permit an inference that the weapon served to protect or otherwise facilitate the offense conduct. *See id.* at 23. The court held simply that the factual circumstances did not support such an inference because the weapon played a role adverse to the "interests" of the crime to which the defendant pled guilty. *Id.* Signaling that it was not laying down a principal of law meant to have broad application, the court noted that there was no evidence that the defendant attempted to sell the drugs taken from his co-conspirator. *See id.* at 23 n. 5.

**108.** *Mennuti,* 679 F.2d at 1035 (overt acts relied upon to establish timeliness must occur during the existence of the conspiracy and be within "the scope of the conspiratorial agreement").

**109.** *See supra* text accompanying notes 87–98.

is impossible to tell whether the 2,250 stripped warrants were sold before, on or after May 8, 1996. Assuming that the settlement date controls, however, all 60,-535 Thermo–Mizer warrants in the account as of March 26, 1996—including both stripped and stolen warrants—were sold within the limitations period.

At oral argument, all assumed that the timeliness of the prosecution turned on which date controlled,[110] this assumption being the logical product of the government's equation of the sales and the receipt of the benefits of the scheme. The Court and counsel therefore discussed two possible theories under which the settlement date would be the operative date. The first was that the affirmative act of ordering the sale on the trade date made the subsequent settlement of the trade part of the overt act even assuming that there was no subsequent affirmative conduct by Pascuito.[111] The second was that the jury was entitled to infer from the evidence before it that the affirmative conduct on the part of Pascuito consisted at least in part of conduct on the settlement date as well as on the trade date.[112]

The first theory, as the Court previously held, fails as a matter of law. In *United States v. Ben Zvi ("Zvi II")*,[113] the Second Circuit held that "[t]o constitute an overt act for purposes of the statute of limitations the act must involve some affirmative conduct or deliberate omission" on the part of the defendant or his or her co-conspirators.[114] The court there concluded

that the wiring of funds from Lloyd's of London to its attorney in New York did not satisfy this standard, even though it was "precipitated by earlier fraudulent acts and omissions of defendant and her coconspirators," because "it did not involve or otherwise turn on any identifiable act or omission of the conspirators as of the time of the wire transfer."[115] Certainly this holding forecloses treating the settlement date as the date of the overt act based solely on affirmative conduct on the trade date.

The crucial inquiry, then, appeared to be whether a rational jury could have found beyond a reasonable doubt that there was "affirmative conduct," within the meaning of *Zvi II*, by Pascuito on the settlement date of the May 1996 trades. Four critical pieces of evidence bearing on this issue were before jury.

First, Nationwide account statements in evidence did not break down a customer's trading activity into a trade date and a settlement date, but indicated only the "date" of the particular transaction.[116] According to these statements, all relevant sales of Thermo–Mizer warrants occurred on or after May 8, 1996. A comparison of these statements with Government Exhibit 500 makes apparent that, at least for the May and June 1996 transactions tabulated above, the account statements reflect the settlement dates, not the trade dates.[117]

Second, Government Exhibit 500, which consists of FBI and NASD analysis[118] of Nationwide account statements and blue

---

110. *See* Tr., July 1, 2002, *passim.*

111. *Id.* at 64–65.

112. *Id.* at 64.

113. 242 F.3d 89, 97 (2d Cir.2001).

114. *Id.; accord United States v. LaSpina,* 299 F.3d 165, 176 (2d Cir.2002).

115. *Zvi II,* 242 F.3d at 97.

116. *E.g.,* GX 90–F; GX 90–G.

117. *Compare* GX 500, B. 12782, *with* GX 90–F; GX 90–G.

118. This analysis was received into evidence without objection as a summary of voluminous records pursuant to Rule 1006 of the Federal Rules of Evidence. *See* Tr. 595–96.

sheets[119] provided by Southwest Securities,[120] gave both trade dates and settlement dates for the transactions in the Feehan account, as reflected in the table above.

Third, Roger Brook Sherman, a securities industry expert, in the course of explaining Government Exhibit 240E, which was an order ticket, testified that it contained both the trade date and the settlement date. He described the trade date as "actually the date that the order was placed" and added "that's when the customer and the broker had the conversation."[121] He then explained that a purchaser does not have to pay for a security at the same time as he or she makes the order. Rather, "the customer actually has a few days to pay for the stock"[122] and that the settlement date is the date "when the customer actually has to pay."[123] Neither party asked Mr. Sherman the meaning of the settlement date as it relates to the seller.

Finally, both Government Exhibit 500 and the Nationwide account statements indicate that when there were sales of warrants, the securities remained in the seller's account until the settlement date.

Defendant is correct in asserting that none of these four pieces of evidence alone demonstrates that Pascuito delivered the securities on the settlement date.[124] The Court initially believed, however, that this evidence, taken as a whole, and inferences reasonably drawn from it, permitted the conclusion that an affirmative act in furtherance of the conspiracy occurred on the settlement date. Specifically, it reasoned that Mr. Sherman's testimony gave rise to the inference that the seller delivered the sold securities on or before the settlement date and that the fact that the securities remained in the Stefanie Feehan account until the settlement date justified the conclusion that the securities in fact were delivered on that date. On further reflection, however, the Court has concluded that there is a flaw in this analysis.

The difficulty is that the Feehan account contained the securities at issue on the trade date and at all subsequent times until the sale was settled. Had the securities been in the hands of Pascuito or Feehan prior to the settlement date, the evidence would have permitted the inference that Pascuito delivered the warrants in furtherance of the conspiracy on the settlement date. This, however, was not the case. While the evidence plainly established that Pascuito placed the sell order on or before the trade date, he did not have the warrants. Nationwide did. As the securities were at Nationwide to begin with, it is a matter of pure speculation as to whether Pascuito engaged in an affirmative act on the settlement date that caused Nationwide to move the securities or whether, instead, Nationwide simply transferred the securities against payment in consequence of Pascuito's sell order a number of days earlier.[125]

---

119. Blue sheets are securities trading records. *Id.* at 587.

120. Southwest Securities was the clearing house for Nationwide during the Gaylord and Thermo–Mizer IPOs. *Id.* at 586–87.

121. *Id.* at 78.

122. *Id.*

123. *Id.* at 79.

124. *See* Def. Supp. Mem. 9–10.

125. The government argues that the Nationwide account statements listing only the settlement date justify an inference that an overt act was committed on the settlement date. If these account statements were the only evidence adduced on this issue, its contention might have merit. However, Government Exhibit 500, which was created through analysis of the account statements and blue sheets provided by Nationwide's clearing house, provides more specific information regarding the same transactions and dispels any such inference.

It turns out, however, that the question of whether Pascuito engaged in affirmative conduct to cause the warrants to leave the Feehan account on the settlement date is immaterial. In the eleventh hour, the government came forward with a subtle shift in emphasis—it recognized that the sales and Pascuito's receipt of their benefits were not necessarily simultaneous. It begins from the premise, articulated by it previously, that a conspirator's knowing receipt of the anticipated economic benefits of a conspiracy is an overt act in furtherance of the conspiracy. It proceeds to contend, for the first time, that there was sufficient evidence to permit the conclusion that Pascuito knowingly received payment for the stripped warrants in the Feehan account on the settlement dates of the May 1996 trades, all of which were within the limitations period, even if there was no evidence of any other affirmative conduct within the limitations period. The Court agrees.

The issue hinges on what constitutes "affirmative conduct" within the meaning of *Zvi II*.[126] Quite reasonably, the government finds its answer in *Zvi II* itself. As noted above, the *Zvi II* court held that the first indictment was untimely because it did not allege an overt act within the limitations period. More specifically, it held that the alleged overt act, wiring of funds by Lloyd's to its New York counsel, was not an overt act in furtherance of the conspiracy because it "did not involve or otherwise turn on any identifiable act or omission of the conspirators as of the time of the wire transfer."[127] In contrast, the panel held that the second indictment had alleged overt acts by the defendant or her co-conspirators within the limitations peri-

od because "it alleged as overt acts the causing of 'checks to be drawn from [Alan J. Martin's bank] account ... in payment of the insurance claim" within the limitations period.[128] The court then explained:

> "A portion of these payments were made to Josi Jewelry, and thus represented the anticipated economic benefits of the conspirators, *see United States v. Mennuti*, 679 F.2d 1032, 1035 (2d Cir.1982) ..., *the knowing receipt of which by the defendant and her co-conspirators constituted overt acts in furtherance of the conspiracy, see United States v. Girard*, 744 F.2d 1170, 1173–74 (5th Cir. 1984)."[129]

Defendant valiantly argues that the Second Circuit did not mean what it said in this passage. He contends that the *Zvi II* court's holding with respect to the first indictment demonstrates that the knowing receipt of funds is not affirmative conduct. But the issue with respect to the first indictment in *Zvi II* did not depend on whether or not the receipt of funds was affirmative conduct. Rather, the first indictment was insufficient because neither of the actors involved in the transaction, Lloyd's agent in London or its counsel in New York, was a co-conspirator of the defendant.[130] The only connection the defendant and her conspirators had with the transaction was that they allegedly had caused Lloyd's to transfer the funds through previous fraudulent conduct.[131] Receipt of funds by Lloyd's counsel, a nonconspirator, could never have been an overt act in furtherance of the conspiracy, regardless of whether the receipt of funds by a co-conspirator could be an overt act.

---

126. *See* 242 F.3d at 97.

127. *Id.*

128. *Id.* at 98.

129. *Id.* (emphasis added).

130. *See id.* at 97.

131. *See id.*

Benussi argues also, with respect to the second indictment in *Zvi II*, that it was the affirmative act of "causing of 'checks to be drawn' "[132] that satisfied the statute of limitations, not the knowing receipt of anticipated economic benefits. Yet if this were the case, surely the Second Circuit would have said so, rather than indicating in no uncertain terms that the knowing receipt of payment by the defendant and her co-conspirators satisfied the overt act requirement.[133] Moreover, the court already had indicated that "caus[ing]" a non-conspirator to perform an act was not sufficient.[134] It follows that the *Zvi II* court must have considered the knowing receipt of the anticipated economic benefits of a conspiracy to be affirmative conduct. Accordingly, the Court holds that, when a general objective of a conspiracy is economic gain, the knowing receipt of the anticipated economic benefits of the charged conspiracy by a conspirator satisfies the overt act requirement for purposes of the statute of limitations.

Here there was ample evidence from which the jury reasonably could have concluded that Pascuito knowingly received payments for the sale of warrants in the Feehan account on the settlement dates of the May 1996 trades. The May 1996 account statement for the Feehan account shows the proceeds of Thermo–Mizer sales entering the account on the settlement dates and therefore within the limitations period.[135] Feehan testified that she never knowingly purchased or sold securities in the Nationwide account, that Pascuito opened the account and had complete control over it, and that Pascuito treated the proceeds of the account as his own.[136] In these circumstances, Benussi's contention that the government failed to adduce evidence that Feehan subsequently transferred the proceeds of these sales to Pascuito is beside the point. Rather, the jury was entitled to conclude that receipt of the proceeds in the Feehan account constituted receipt by Pascuito himself and that this occurred on or after May 8, 1996, even if the "sell" orders were placed earlier and if Pascuito engaged in no other conspiratorial conduct within the limitations period.

Where, as here, there has been a subtle shift in the government's theory, it is critical to be certain that the charge was adequate to comprehend the basis currently advanced to sustain the conviction and, perhaps, that the point was adequately brought to the jury's attention. And that is the case. Although the government never in argument parsed the Pascuito trades to differentiate between the sale of the securities and the receipt of the proceeds, its summation made clear, in specific relation to the statute of limitations defense, its contention that the conspiracy "ended only when [Benussi and the others] got the payoff" and that this occurred "in May and June of 1996[, when Lou Pascuito] sold the warrants ... and got his money."[137] The Court, as noted, charged

---

**132.** *Id.* at 98.

**133.** *Id.* Benussi's argument regarding *United States v. Girard*, 744 F.2d 1170 (5th Cir.1984), the case cited by the *Zvi II* court, is unpersuasive. He is correct that the defendant in that case received payment after signing a form, which more neatly fits into the category of affirmative conduct. *See id.* at 1173. However, the form was undated, *see id.,* and accordingly its signing could not have satisfied the statute of limitations. More importantly, the *Girard* court chose to focus explicitly on the

acceptance of money, and its holding is clear and unambiguous. *See id.* at 1173 ("We rely solely on Girard's act of accepting and retaining payment and not the Housing Authority's act in issuing the check.").

**134.** *See Zvi II*, 242 F.3d at 97.

**135.** GX 90–F.

**136.** *See* Tr. 506–07, 509–14.

**137.** *Id.* at 689–91.

"that the conspiracy continued until all of the conspirators received their anticipated economic benefits or payoffs ... [and that i]t is solely for you to determine at what time the alleged coconspirators received their anticipated economic benefits, if in fact that occurred."[138] In consequence, the jury was properly instructed and perfectly justified in concluding that the prosecution was timely on the theory that Pasciuto's receipt of the sale proceeds within the limitations period was sufficient. Accordingly, the jury was entitled to find that the prosecution was timely.

### B. Relation Back

Benussi argues that S5 does not relate back to S2 because it (1) does not aver the same overt acts within the limitations period as S2, (2) changed the time frame of the charged conspiracy, and (3) did not allege a conspiracy to violate 15 U.S.C. § 78o(c)(1)(A).[139] His argument lacks merit.

■■ "The filing of an indictment tolls the statute of limitations for the charges contained in that indictment."[140] Superseding indictments, filed while the original indictment is pending, relate back to earlier indictments if they do not "broaden or substantially amend the original charges."[141] "What is required of the Court when conducting a comparative analysis of two indictments is a meticulous perusal of the documents while remaining mindful of the judicial policy favoring repose in close cases."[142] Repose is not automatic, however. "Superseding indictments have been deemed timely when they simply added detail to the original charges, narrowed rather than broadened the charges, contained amendments as to form but not substance, or were otherwise trivial or innocuous."[143] Notice to the defendant of the charges against him and of the time period at issue is the "touchstone" of this analysis,[144] and prejudice to the defendant in preparing his case is a corollary concern.[145]

■ Defendant's second and third points of difference are inconsequential. As noted above, S5 alleges that the conspiracy ended in June 1996, whereas S2 alleged that the conspiracy ended in August 1996. Thus, S5 narrowed rather than expanded the time period.[146] Similarly, S5's deletion of the 15 U.S.C. § 78o(c)(1)(A) object also narrowed the charges. Equally important, the S5 conspiracy charge rests on essentially the same factual allegations as S2[147] and required no preparation of new evidence or

---

138. *Id.* at 787–88.

139. Def. Mem. 28.

140. *United States v. Zvi,* 168 F.3d 49, 54 (2d Cir.) ("*Zvi I*"), *cert. denied,* 528 U.S. 872, 120 S.Ct. 176, 145 L.Ed.2d 148 (1999); *United States v. Gengo,* 808 F.2d 1, 3 (2d Cir.1986); *United States v. Grady,* 544 F.2d 598, 601 (2d Cir.1976).

141. *Gengo,* 808 F.2d at 3; *Grady,* 544 F.2d at 602.

142. *United States v. Frequency Elecs.,* 862 F.Supp. 834, 844 (E.D.N.Y.1994) (internal quotation marks omitted).

143. *Zvi I,* 168 F.3d at 54.

144. *Gengo,* 808 F.2d at 3.

145. *See, e.g., United States v. Robilotto,* 828 F.2d 940, 949 (2d Cir.1987), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 662 (1988).

146. *See Grady,* 544 F.2d at 602 (holding that charges related back when "to the extent any change of substance was made at all, the charges were narrowed, not broadened"); *United States v. O'Bryant,* 998 F.2d 21, 24 (1st Cir.1993) (finding that narrowing of time frame did not "break the chain of continuity").

147. *Compare* S5 ¶¶ 15–33, *with* S2 ¶¶ 15–33.

defenses because of the omission of the 15 U.S.C. § 78o(c)(1)(A) object.[148]

■ Defendant's first argument requires more discussion. The Second Circuit has not specifically addressed whether the addition or alteration of overt acts constitutes a substantial alteration. In fact, in *United States v. Gengo*,[149] the panel declined to address the issue.[150] Nevertheless, the addition or alteration of overt acts appears to be part way on the spectrum between purely technical amendments and more substantial ones, such as those that require a defendant to defend against additional charges, allege violations of an additional statute, contain different elements, rely on different evidence, and expose a defendant to a potentially much greater sentence.[151]

Benussi argues that the addition or alteration of overt acts is extremely important on the specific facts of this case. The statute of limitations was a major aspect of his defense, and issues regarding the occurrence and timing of overt acts were important to defense counsel in preparing the case for trial. Thus, the government's initial failure to identify the overt acts it intended to rely upon, Benussi maintains, might have caused him substantial prejudice.[152] Yet this argument begs the question. While defense counsel might have made tactical choices based in part on the overt acts alleged in S2, the real question is whether the changes in S5 were material.

The better view is that the addition or alteration of overt acts, at least in the circumstances of this case, is merely a matter of filling out the details of a charge, and does not go to its heart.[153] Common sense suggests that a defendant like Benussi is sufficiently on notice of the charges against him when the two indictments charge the same conduct, the same conspiracy, with the same objects, in violation of the same statute.[154] Moreover, specific details regarding overt acts arguably are inconsequential in terms of preparing the defendant's case because "the overt act element of a conspiracy charge may be satisfied by an overt act that is not specified in the indictment," absent tangible prejudice to the defendant.[155] And tangible prejudice is unlikely given that

148. *See Gengo*, 808 F.2d at 4.

149. 808 F.2d 1.

150. *See id.* at 3.

151. *See Zvi I*, 168 F.3d at 55.

152. Moreover, some language in Second Circuit opinions might imply that adding overt acts is more a substantial than formal or innocuous alteration. For instance, in *United States v. Grady*, the court held that the superseding indictment related back and noted that "[e]ach and every overt act alleged in both indictments also was the same." 544 F.2d at 602. Similarly, in *Gengo*, the court looked with approval on the fact that the superseding indictment's time frame as corrected encompassed all of the ten overt acts charged in the original indictment. 808 F.2d at 4. However, these cases are not on all fours: the *lack* of additional overt acts as a factor militating towards relation back in one

case does not mean that the *presence* of additional overt acts in another is dispositive.

153. Other circuits addressing the issue have followed this logic, holding that the addition of overt acts or other underlying detail does not materially broaden the charge. *E.g., O'Bryant*, 998 F.2d at 24–25; *United States v. Lash*, 937 F.2d 1077, 1081–82 (6th Cir.), *cert. denied sub nom. Ross v. United States* 502 U.S. 949, 112 S.Ct. 397, 116 L.Ed.2d 347 (1991).

154. *See O'Bryant*, 998 F.2d at 24. Again, the Court is aware that S2 contained a securities fraud object not contained in S5, but this narrowing of the charge is not material.

155. *United States v. Frank*, 156 F.3d 332, 337 (2d Cir.1998), *cert. denied*, 526 U.S. 1020, 119 S.Ct. 1257, 143 L.Ed.2d 353 (1999). The statute of limitations also may be satisfied by an overt act not specified in the indictment, absent undue prejudice from the variance. *Id.* at 339; *see also United States v. Dolan*, 120

"[w]here the indictment fairly specifies the offense charged and notifies the defendant of the particulars, the defendant has knowledge that other overt acts underlying the conspiracy might be pleaded at trial." [156]

Here, Benussi was on clear notice of the nature of the alleged conspiracy, its alleged duration, the securities involved, and that sales of Gaylord and Thermo–Mizer would be relevant to satisfaction of the statute of limitations. Accordingly, S5 did not broaden or substantially amend the charges found in S2 by shortening the alleged duration of the conspiracy, omitting the 15 U.S.C. § 78o(c)(1)(A) object, and substituting overt acts. It therefore relates back to S2.

## C. Constructive Amendment

Benussi argues next that the government violated his Fifth Amendment rights by constructively amending the indictment through the proof offered at trial. He relies on the difference between the overt acts listed in S5, which refer to sales of Thermo–Mizer warrants within the limitations period, and the proof at trial, which revealed the sale of both Thermo–Mizer and Gaylord warrants during this period. In addition, he relies on the evidence at

trial regarding his continued communications with Howard Zelin after the Nationwide office closed in April 1996. His argument lacks merit.

 "To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." [157] Constructive amendments are *per se* violations of the Fifth Amendment that require reversal even without a showing of prejudice.[158]

 "Not all modifications constitute constructive amendments, however." [159] No constructive amendment occurs " '[w]here the charges are "constructively narrowed" or where a generally framed indictment encompasses the specific legal theory or evidence used at trial.' " [160] " 'As long as the crime and the elements of the offense that sustain conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime.' " [161] In other words,

F.3d 856, 866 (8th Cir.1997) ("[T]he government may satisfy its requisite showing under the statute of limitations by means of an overt act not listed in the indictment.") (citing *United States v. Schurr*, 794 F.2d 903, 907 n. 4 (3d Cir.1986) and *United States v. Read*, 658 F.2d 1225, 1239 (7th Cir.1981)).

**156.** *United States v. Lewis*, 759 F.2d 1316, 1344 (8th Cir.) (citing *United States v. Elliott*, 571 F.2d 880, 911 (5th Cir.), *cert. denied sub nom. Hawkins v. United States*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978)), *cert. denied sub nom. Milburn v. United States*, 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985).

**157.** *Frank*, 156 F.3d at 337; *see United States v. Vebeliunas*, 76 F.3d 1283, 1290 (2d Cir.),

*cert. denied*, 519 U.S. 950, 117 S.Ct. 362, 136 L.Ed.2d 253 (1996).

**158.** *Vebeliunas*, 76 F.3d at 1290 (quoting *United States v. Clemente*, 22 F.3d 477, 482 (2d Cir.), *cert. denied sub nom. Demolfetto v. United States*, 513 U.S. 900, 115 S.Ct. 258, 130 L.Ed.2d 178 (1994)).

**159.** *United States v. Wallace*, 59 F.3d 333, 337 (2d Cir.1995).

**160.** *Id.* (quoting *United States v. Morgenstern*, 933 F.2d 1108, 1115 (2d Cir.1991), *cert. denied*, 502 U.S. 1101, 112 S.Ct. 1188, 117 L.Ed.2d 430 (1992)).

**161.** *Id.* (quoting *United States v. Miller*, 471 U.S. 130, 136, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985)).

" '[a]n amendment ... occurs when the charging terms of the indictment are altered.' "[162]

Here, the government's proof certainly did not alter the *terms* of S5. The evidence of continued communications between Zelin and Benussi merely helped round out the prosecution's narrative of the charged events[163] and went to Benussi's relationship with various co-conspirators—both indicted and unindicted.[164] Moreover, to the extent this testimony otherwise might have created any risk that the jury might convict Benussi for unrelated fraudulent conduct engaged in through the First American Securities office that he opened after leaving Nationwide,[165] the Court obviated such risk by giving the jury a limiting instruction regarding uncharged, fraudulent conduct engaged in by Benussi.[166]

The evidence of Pascuito's sales of Gaylord warrants was offered to satisfy the statute of limitations with respect to the charged conspiracy and no other. This is the quintessential case of a generally framed indictment encompassing the specific evidence used at trial.[167] Benussi's constructive amendment argument therefore fails.

## D. Prejudicial Variance

■ Benussi argues also that introduction of these two pieces of evidence constituted a prejudicial variance. "A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment."[168] To detect variance, courts ask whether " 'the defendant was given notice of the 'core of criminality' to be proven at trial.' "[169] However, a variance will furnish the ground for overturning a verdict only if defendant shows that the variance " 'resulted in *substantial* prejudice.' "[170] Prejudice does not result "where the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense."[171]

Benussi has not shown a material variance with respect to the evidence of continued conversations between himself and Zelin. As noted above, this evidence provided nothing more than background information. As far as the jury knew, it was

162. *Frank,* 156 F.3d at 338 n. 5 (emphasis omitted) (quoting *United States v. Zingaro,* 858 F.2d 94, 98 (2d Cir.1988)).

163. *Cf. Old Chief v. United States,* 519 U.S. 172, 186–88, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (prosecution usually entitled to reject defendant's offer of stipulation in order to develop "a colorful story full of descriptive richness").

164. Defendant's argument that evidence of these conversations were offered to satisfy the statute of limitations is dealt with below. *See infra* Part II.D.

165. Tr. 286–88.

166. *Id.* at 807–09.

167. *See Wallace,* 59 F.3d at 337.

168. *Frank,* 156 F.3d at 338 n. 5 (emphasis omitted) (quoting *United States v. Zingaro,* 858 F.2d at 98).

169. *Wallace,* 59 F.3d at 338 (quoting *United States v. Heimann,* 705 F.2d 662, 666 (2d Cir.1983), in turn citing *United States v. Sindona,* 636 F.2d 792, 797–98 (2d Cir.1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981)).

170. *Id.* (quoting *United States v. McDermott,* 918 F.2d 319, 326 (2d Cir.1990), *cert. denied,* 500 U.S. 904, 111 S.Ct. 1681, 114 L.Ed.2d 76 (1991)) (emphasis in *Wallace* opinion).

171. *Heimann,* 705 F.2d at 669 (citing *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), *overruled on other grounds by Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960)).

offered to round out the details of the story of the charged crime.[172]

Benussi argues that this evidence varied from the indictment because the government offered it to satisfy the statute of limitations. But there is no indication that the jury so considered it. Indeed, Benussi admits that the government never developed this evidence further at trial nor argued to the jury that these conversations could satisfy the statute of limitations.[173] There is no requirement that the indictment contain every minute detail of the government's proof at trial.[174]

With respect to Pascuito's sales of Gaylord warrants, the Court is convinced that the government's introduction of this evidence did not prejudice Benussi. It is hard to imagine two overt acts more substantially similar than Pascuito's sales of Gaylord and Thermo–Mizer warrants in May and June of 1996. S5 provided ample notice that the scheme involved the manipulation of the price of both Gaylord and Thermo–Mizer warrants, that the brokers were bribed with both types of warrants, and that the contemplated payoff was the sale of both types of warrants at inflated prices. Moreover, it is disingenuous for the defendant to claim that his preparation of the case was prejudiced when both securities were implicated so clearly in the charged scheme, and defense counsel knew from the indictment that Pascuito's sales

through the Feehan account would be central to the statute of limitations issue. Finally, defendant does not even attempt to argue that the alleged variance would subject him to the risk of another prosecution. Accordingly, even assuming that the government's introduction of evidence regarding Pascuito's sales of Gaylord warrants during the limitations period created a variance, it did not cause him substantial prejudice and his variance argument therefore fails.

### E. New Trial

Finally, Benussi argues that he is entitled to a new trial because the general verdict returned by the jury is supportable, if at all, on one ground but not on others, and it is impossible to tell whether the jury found that the statute of limitations was satisfied based on an adequate or inadequate ground. Specifically, he argues first that, even if Pascuito's sales of warrants on or after May 8, 1996 satisfied the statute of limitations for the securities fraud object of the charged conspiracy, they were insufficient with respect to the wire fraud and commercial bribery objects.[175] Second, he argues that a new trial would be warranted because the jury may have found the statute of limitations satisfied based on Pascuito's sale of stolen Thermo–Mizer warrants.[176] Both these arguments fail, however, because they

---

172. It is true that in a letter to the Court, dated February 12, 2002, in anticipation of Benussi's pre-verdict Rule 29 motion, the government argued that these conversations satisfied the statute of limitations. *See* Letter from Court E. Golumbic and David B. Anders, Assistant United States Attorneys, to the Court 8 (Feb. 12, 2002). Of course, the jury never knew of this letter. Moreover, it would lead to an intolerable situation if district courts overturned jury verdicts on variance grounds every time prosecutor made overambitious use of the facts in the record in argument to the court outside the presence of the jury.

173. Def. Mem. 21.

174. *See Frank*, 156 F.3d at 338 (" 'Because proof at trial need not, indeed cannot, be a precise replica of the charges in the indictment, [the Second Circuit] has consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial.' " (quoting *Heimann*, 705 F.2d at 666)).

175. Def. Mem. 22–26.

176. *Id.* at 34–35.

point only to purported factual, as opposed to legal, inadequacies in the government's case.

Benussi invokes *Yates v. United States* [177] in support of his position. *Yates* involved a single-count federal indictment charging a conspiracy "(1) to advocate and teach the duty and necessity of overthrowing the Government of the United States by force and violence, and (2) to organize, as the Communist Party of the United States, a society of persons who so advocate and teach." [178] The first of these objects violated Section 2(a)(1) of the Smith Act of 1940, and the second violated Section 2(a)(3) of the same. The Court held that the "organizing" object was insufficient as a matter of law because the statutory term referred to initial formation, and the Communist party had been "organized" in that sense at a time beyond the period of the applicable statute of limitations. [179] It then rejected the government's argument that the convictions nonetheless could stand on the basis of the "advocacy" object, stating:

"In these circumstances we think the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." [180]

■ Whatever broad application *Yates* once may have had, its holding was limited in important respects by *Griffin v. United States.* [181] The Supreme Court there held that when disjunctive theories are submitted to the jury and the jury renders a general verdict of guilty, appeals based on evidentiary deficiencies must be treated differently than those based on legal deficiencies. [182] If the challenge is evidentiary, then the verdict will be affirmed as long as there was evidence sufficient to support one of the theories presented. Where, on the other hand, the challenge is legal and any of the theories was legally insufficient, then the verdict must be reversed. [183] In other words, the *Griffin* Court "restricted the holding of *Yates* to cases where one of the alleged objects of the conspiracy is *legally* defective." [184] " 'Legal error' is not insufficiency of evidence, but 'means a mistake about the law, as opposed to a mistake concerning the weight or factual import of the evidence.' " [185]

■ *Yates* superficially appears to support Benussi's first argument because it happens to involve a statute of limitations question. In that case, however, the Court determined that one of the alleged objects could not satisfy the statute of limitations as a matter of law. [186] Here, Benussi

**177.** 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), *overruled on other grounds by Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

**178.** *Id.* at 300, 77 S.Ct. 1064.

**179.** *Id.* at 304–11, 77 S.Ct. 1064.

**180.** *Id.* at 312, 77 S.Ct. 1064 (citing, *inter alia, Stromberg v. California,* 283 U.S. 359, 367–68, 51 S.Ct. 532, 75 L.Ed. 1117 (1931)).

**181.** 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991).

**182.** *See id.* at 56–60, 112 S.Ct. 466.

**183.** *See id.; United States v. Garcia,* 992 F.2d 409, 415–16 (2d Cir.1993); *see also Keating v.*

*Hood,* 191 F.3d 1053, 1062–63 (9th Cir.1999), *cert. denied,* 531 U.S. 824, 121 S.Ct. 69, 148 L.Ed.2d 34 (2000), *abrogated on other grounds by Mancuso v. Olivarez,* 292 F.3d 939, 944 n. 1 (9th Cir.2002).

**184.** *United States v. Mann,* 161 F.3d 840, 857 (5th Cir.1998) (emphasis in original), *cert. denied,* 526 U.S. 1117, 119 S.Ct. 1766, 143 L.Ed.2d 796 (1999).

**185.** *Id.* (quoting *Griffin,* 502 U.S. at 59, 112 S.Ct. 466).

**186.** *See Yates,* 354 U.S. at 310–11, 77 S.Ct. 1064.

claims only that Pascuito's sales were not in furtherance of the second and third objects of the charged conspiracy.[187] His argument is purely factual.[188] In other words, "he does not demonstrate that one of the alleged objects of the conspiracy was 'legally defective,' in the *Griffin* sense; he argues only that there was insufficient evidence of acts committed within the limitations period as to some of the alleged objects of the conspiracy."[189] Accordingly, *Griffin* forecloses Benussi's first argument.

Benussi's second argument fails for the same basic reason. The Court has concluded that no reasonable jury could have found that Pascuito's sales of stolen Thermo–Mizer warrants were in furtherance of the charged conspiracy. But the Court is not persuaded that this result is compelled as a matter of law whenever one co-conspirator steals from another.[190] At worst, the government merely presented a factually deficient theory to the jury. *Griffin* therefore mandates upholding the verdict.[191]

### III. Conclusion

For the foregoing reasons, defendant's motion is denied in all respects.

SO ORDERED.

**187.** As a general rule, the "in furtherance" issue, like the issue of scope, is for the jury. *See, e.g., Grunewald,* 353 U.S. at 411–15, 77 S.Ct. 963; *United States v. Fontenot,* 483 F.2d 315, 322 (5th Cir.1973); *United States v. Armone,* 363 F.2d 385, 401 (2d Cir.), *cert. denied,* 385 U.S. 957, 87 S.Ct. 391, 17 L.Ed.2d 303 (1966). It should be noted that Benussi does not claim that the Court improperly instructed the jury regarding what it had to find to conclude that the government had satisfied the statute of limitations.

**188.** Benussi cites not a single case to support his argument that Pascuito's sales could not have been in furtherance of the wire fraud and commercial bribery objects. Rather, his arguments flow from assumptions he makes regarding the scope of a conspiracy having these crimes as their objects. *See* Def. Mem. 24, 25.

**189.** *Mann,* 161 F.3d at 857.

**190.** *See supra* note 107.

**191.** *See Griffin,* 502 U.S. at 59, 112 S.Ct. 466.